

**SO ORDERED.**

**SIGNED this 8th day of July, 2013.**



_____
Robert E. Nugent
United States Chief Bankruptcy Judge
_____

DESIGNATED FOR ON-LINE PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

IN RE:                )

JANFORD R. KEITH,      )     Case No. 10-12997
KATHLEEN KEITH,       )     Chapter 12
                         )
           Debtors.    )
_____)

### <u>MEMORANDUM OPINION</u>

Since 1986, family farmers have been able to reorganize their farming operations in chapter 12.[1] Even though that chapter gave them the ability to cram down secured claims for payment over time, family farmers who disposed of their farm

_____

[1] Chapter 12 has not been in continuous effect since 1986, having lapsed in 1998 only to be retroactively renewed twice until being made permanent in 2005 with the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Pub.L. No. 109-8, § 1001(a)(1), April 20, 2005, 119 Stat. 23.

-1-

assets in liquidation sales or whose assets were foreclosed and sold found themselves saddled with significant non-dischargeable tax liability arising from the gains realized on those sales. Prior to 2005, those tax obligations were priority claims under §507(a)(8) that had to be paid in full under the farmer's chapter 12 plan.[2] When Congress made chapter 12's enactment permanent as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, it amended §1222(a)(2) by adding subpart (A) which strips certain gain-based tax claims of their priority and allows them to be paid pro rata among the other unsecured claims and discharged when the farmer debtor's plan is complete.

After §1222(a)(2)(A) took effect, the Internal Revenue Service tried to limit its effect on revenue collection by claiming three things. First, the IRS urged bankruptcy courts all over farm country to conclude that only claims that arose from *prepetition* sales of farm assets were eligible for this favorable treatment. The IRS won that battle in the United States Supreme Court in *Hall v. United States*.[3] Second, the IRS contended that only the tax generated by gain on the sale of capital assets, as opposed to ordinary farm product sales, qualifies for unsecured treatment. Third, the IRS contended that the unsecured portion of the debtor's prepetition taxes should be determined by prorating the debtor's total tax liability by the portion of it that is generated by taxable gain. *Hall* addressed neither of these latter two issues.

---

[2] *See* former § 1222(a)(2) (2004).
[3] ___ U.S. ___, 132 S. Ct. 1882, 182 L.Ed. 2d 840 (2012).

The Keiths filed this case before *Hall* was decided. After it was decided, they and the IRS reserved in the confirmation order the issues of what part of their income tax debt could be treated as an unsecured claim under § 1222(a)(2)(A) and what method of calculating that tax liability should be used.[4] The Keiths and IRS stipulated to the facts and submitted memoranda of law.[5]

I must first decide whether the income tax liability generated by the debtors' farm income from the prepetition sale of livestock and crops they raised and reported on Schedule F – Profit or Loss from Farming (Form 1040) of debtors' 2009 income tax return qualifies as a general unsecured claim under § 1222(a)(2)(A). If it does, I then consider whether the marginal allocation or the proportional allocation method should be used to calculate how much of the IRS's claim is entitled to priority. The Government contends that Schedule F farm income is not entitled to § 1222(a)(2)(A)'s favorable treatment. It includes all of the debtors' 2009 income on Schedule F in the priority tax calculation and asserts that its priority claim amounts to $99,252 using the proportional allocation method. The debtors claim the income from the sale of livestock and crops on their Schedule F should receive favorable treatment under § 1222(a)(2)(A). They say that the Government should have employed the marginal allocation method for calculating its priority tax claim. They calculate the

---

[4] Dkt. 60, pp. 1-3.
[5] Dkt. 81, 86-88.  Debtors appear by their attorney W. Thomas Gilman of Redmond & Nazar, L.L.P.  The IRS appears by its attorneys Kathryn Keneally, Assistant Attorney General, U.S. Dept. of Justice, Tax Div. and Martin M. Shoemaker, U.S. Dept. of Justice, Tax Div.

-3-

Government's priority tax claim to be $26,433 and, if the crop insurance proceeds they reported on Schedule F income also qualify for § 1222(a)(2)(A) treatment, it would shrink to $2,380.

After careful carefully considering both questions, I conclude that the proceeds of sales of farming end products – feeder cattle and crops raised by the debtors – and crop insurance proceeds are not farm assets "used" in a farming operation and therefore are not entitled to the favored treatment of § 1222(a)(2)(A). I also conclude that properly applying § 1222(a)(2)(A) requires the Government to employ the marginal allocation method in calculating the extent of its priority tax claim.

### *Jurisdiction*

The court has jurisdiction of both the allowance of claims against the estate and plan confirmation under 28 U.S.C. § 157(b)(2)(B) and (L).[6] On August 16, 2011, I confirmed the debtors' chapter 12 plan subject to determining the proper treatment of the IRS's tax claim under § 1222(a)(2)(A) and determining the amount of its priority tax claim.[7]

### *Burden of Proof*

This matter requires the Court to determine what portion of the IRS's allowed tax claim will receive priority payment (payment in full under § 1222(a)(2)) and whether the debtors' proposed plan treatment complies with the provisions of chapter

---

[6] 28 U.S.C. § 157(b)(1) and § 1334.
[7] Dkt. 60.

-4-

12. The IRS timely filed its proof of claim.[8]  The Government's proof of claim is prima facie evidence of the validity and amount of the claim.[9] When the debtors object to the proof of claim, they bear the burden of producing evidence and facts to meet the presumed validity of the filed claim.[10] If debtors are successful in meeting that presumption, the burden shifts to the IRS to prove the validity and amount of its claim.[11] At the same time, the debtors, as the plan proponent, bear the burden of proving that their plan complies with the provisions of § 1222, including the plan treatment to be afforded priority claims in subsection (a)(2)(A).[12]

### *Stipulated Facts[13]*

The debtors' 2009 federal income tax return is dated July 8, 2010.[14]  They reported a  tax due of $297,081, after a $838 credit for tax payments. They filed this case on August 30, 2010 and their chapter 12 plan on November 29, 2010. Under the plan, debtors proposed to treat all of their tax debt as a § 1222(a)(2)(A) general

---

[8] Dkt. 81, ¶ 5.

[9] Section 502(a) (filed claim is deemed allowed unless objected to); Fed. R. Bankr. P. 3001(f) and 3002(a);*In re Hudson Oil Co.,* 91 B.R. 932, 945 (Bankr. D. Kan. 1988); *In re Coleman American Companies, Inc.,* 26 B.R. 825, 830 (Bankr. D. Kan. 1983).

[10] *In re Hudson Oil Co., supra* at 945; *In re Broadband Wireless Intern. Corp.,* 295 B.R. 140, 145 (10th Cir. BAP 2003); *In re Harrison,* 987 F.2d 677, 680 (10th Cir. 1993).

[11] *Hudson Oil Co., supra; In re Broadband Wireless Intern. Corp., supra.*

[12] *See* § 1225(a)(1) (In order for plan to be confirmed, it must comply with the provisions of chapter 12); *In re Ames,* 973 F.2d 849, 851(10th Cir. 1992) (Chapter 12 debtors bear burden of establishing all elements necessary for confirmation of plan.).

[13] The *corrected* stipulations are contained in Dkt. 81.

[14] The 2009 tax return and accompanying tax schedules are attached as an exhibit to the original stipulations, Dkt. 80-1.

-5-

unsecured claim and to pay it with the monthly disposable income from their non-farming jobs. The debtors were not reorganizing their farming operation, having sold most, if not all, of their non-exempt real and personal property prepetition.[15] The IRS filed the only objection to the chapter 12 plan.[16] It filed a proof of claim on September 20, 2010, asserting a priority claim in the amount of $301,574.68 ($297,081 tax and $4,493.68 interest to petition date) and an unsecured nonpriority claim in the amount of $7,438.42 for a total claim of $309,013.10.[17] The IRS assessed the 2009 tax on August 16, 2010.[18]

Prior to their filing, the debtors were engaged in a "farming operation" within the meaning of 11 U.S.C. § 101(21). In their 2009 tax return, debtors reported income from three components that are relevant here:

(1) long-term capital gains of $230,533 [Line 13, Form 1040 (derived from Schedule D - capital gains and losses and Form 4797, Part I)];

(2) ordinary gains in the amount of $512,197 [Line 14, Form 1040 (derived from Form 4797, Part II and III - sales of business property)]; and

(3) net farming profit of $283,662 [Line 18, Form 1040 (derived from Schedule F – profit or loss from farming)].[19]

---

[15] Dkt. 10. Debtors had no secured creditors or claims. Apart from the tax debt, debtors only had unsecured debt, including Mrs. Keith's student loan debt.

[16] Dkt. 20.

[17] Proof of Claim No. 10.

[18] *Id.*

[19] Debtors 2009 1040 tax return and accompanying Schedules and Forms were stipulated into evidence and may be found at Dkt. 80-1.

-6-

The parties stipulate that the gains reported on Line 13 and 14 of Form 1040 were the result of prepetition sales of farm assets used in the farming operation and that the tax on that gain should be stripped of its priority under § 1222(a)(2)(A) and treated as an unsecured claim.[20] The gain on Line 13 resulted from the sale of land and a swather. The gain on Line 14 is attributed to the sale of breeding livestock, equipment, a shed, and land.

The IRS contends that the tax on the $283,662 net farm profit reported on Line 18 is not entitled to § 1222(a)(2)(A)'s favorable treatment. Line 18 income is "Farm income or (loss)" derived from Schedule F. The debtors' farm income reported on Schedule F came from three sources: the sale of feeder cattle, grain, and other products they raised, including alfalfa, corn, and sunflowers for $355,179 [Line 4], agricultural program payments of $14,597 [Line 6a], and crop insurance proceeds of $80,764 [Line 8a].[21]

The parties stipulate that the total farming expenses on Schedule F should all be subtracted from the Line 4 sales income and that this income stemmed from the "[s]ales of livestock, produce, grains, and other products you raised."[22] The question is whether the tax on this Schedule F income "arises as a result of the sale, transfer,

_____

[20] Dkt. 81, p. 3, ¶ 9.
[21] Dkt. 80-1, p. 12, Sched. F, Lines 4, 6a, and 8a.
[22] *Id.*, Line 4. *See also* Dkt. 81, p. 4, ¶s 12-13 (All of these products were held less than one year.).

-7-

exchange, or other disposition of any farm asset used in the debtor's farming operation" as § 1222(a)(A) provides.[23]

The parties stipulated to various calculations of the debtors' priority tax liability under both the proportional and marginal allocation methods.[24] These calculations are as follows. The IRS applied the proportional method by determining the percentage of gross income attributable to the gain income reported on Form 1040, Lines 13 and 14 and the percentage of gross income attributable to all other income on Form 1040, including Line 18 (Schedule F, net farm income). Concluding that 71% of their gross income was attributable to Lines 13 and 14 while 29% of their gross income was attributable to all other sources of income, the government multiplied the total tax due on Form 1040, Line 55, $278,632, by .29 to arrive at the amount of the tax attributable to non-gain, ordinary income, $80,803. Then it added the debtors' self-employment tax of $19,287 and deducted the amount of $838 for tax payments, yielding a priority tax claim of $99,252.[25] The remainder of the IRS's tax claim ($278,632- $99,252=$179,380) is attributable to the Line 13 and 14 gains from sale of farm assets used in the farming operation. That amount is stripped of priority and should be treated as an unsecured claim under § 1222(a)(2)(A). Any part of this unsecured tax debt remaining unpaid at the end of the plan term is discharged.

---

[23] 11 U.S.C. § 1222(a)(2)(A).
[24] Dkt. 81, ¶s 15-17.
[25] Dkt. 81, ¶ 15.

The debtors applied the marginal method and performed two calculations. The first assumed that the tax on the Form 1040, Line 13 and 14 gains as well as the Schedule F, Line 4 income of $355,179 from the sale of livestock and crops raised by debtors would receive favorable treatment under § 1222(a)(2)(A) and be treated as an unsecured claim. The second calculated the priority portion of the tax claim by determining the tax on all remaining sources of income pro forma, allowing deductions from adjusted gross income for the standard deduction and personal exemption to arrive at taxable income of $85,095. The tax on this amount together with the recalculated self employment tax, less tax prepayments, yields a priority tax claim of $26,433.[26] The balance of the tax debt is unsecured and subject to discharge if not paid in full upon completion of the plan.

The debtors' alternative marginal calculation assumes that the tax on the gains from Form 1040, Lines 13 and 14, Schedule F, Line 4 income, *and* Schedule F, Line 8b crop insurance proceeds of $80,764 would be treated as unsecured claims under § 1222(a)(2)(A). The remaining sources of income less the standard deduction and personal exemption equals a taxable income figure of $10,037. The tax on this figure plus the recalculated self employment tax and less tax payments yields a priority tax claim of $2,380.[27] The balance of the tax debt would be an unsecured claim and subject to discharge.

---

[26] Dkt. 81, ¶ 16.
[27] Dkt. 81, ¶ 17.

The stipulations do not include a marginal allocation calculation of the amount of the priority tax claim assuming that only the tax on Form 1040, Lines 13 and 14, gains would receive the § 1222(a)(2)(A) treatment.

*Analysis*

With the facts that control this matter established, we turn to the meaning of the statutory language of § 1222(a)(2)(A) to determine whether the tax attributable to the Schedule F income should be excluded from the priority tax calculation. If that portion of the tax should be treated as a priority claim, we then must consider which is the appropriate method for determining how much of the Government's claim should be accorded that priority.

**A.      *Hall v. United States and Section 1222(a)(2)(A)***

Section 1222(a)(2)(A) states:

(a) The plan shall–

***

(2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507, unless--

(A) the claim is a claim owed to a governmental unit *that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation*, in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section 507, but the debt shall be treated in such manner only if the debtor receives a discharge; or
(B) the holder of a particular claim agrees to a different treatment of that claim;[28]

_____

[28] 11 U.S.C. § 1222(a)(2)(A) (Emphasis added).

-10-

Thus, chapter 12 debtors are granted some level of relief from taxes that are incurred on gains generated by the voluntary or involuntary disposition of their farm-related assets. Shortly after this section took effect, litigation about the scope of this relief arose. The most-often litigated issue was whether this relief applied to gains taxes that were generated postpetition. After different Courts of Appeal reached different results, the Supreme Court granted certiorari in *Hall v. U.S.* and resolved that issue in favor of the taxing authorities, holding that only the taxes generated by prepetition dispositions of farm assets could be accorded this preferential treatment.[29]

*Hall* resolved a split among the Eighth, Ninth, and Tenth Circuits on whether the income tax arising from the *postpetition* sale of farm assets could be stripped of its priority under § 1222(a)(2)(A).[30] Those Circuit cases were *Knudsen, Dawes,* and *Hall.*[31] Unlike the current case, all of these cases involved tax claims arising from the *postpetition* sale of farm assets. Under § 1222(a)(2) priority claims under § 507 must

_____

[29] *Hall v. United States,* ___ U.S.___, 132 S. Ct. 1882, 182 L.Ed 2d 840 (2012).

[30] 132 S. Ct. at 1886, n. 1.

[31] *Knudsen v. IRS,* 581 F.3d 696 (8th Cir. 2009) (taxes arising from postpetition sale of farm assets could be stripped of priority status under the § 1222(a)(2)(A) exception and discharged), *abrogated by Hall v. United States,* 132 S. Ct. 1882 (2012); *United States v. Dawes,* 652 F.3d 1236 (10th Cir. 2011) (postpetition income taxes incurred from sale of a farm asset during chapter 12 proceeding were not dischargeable and were not eligible for treatment as unsecured claims under § 1222(a)(2)(A)); and *United States v. Hall,* 617 F.3d 1161 (9th Cir. 2010) (taxes arising from postpetition sale of farm assets are not priority claims and ineligible for the § 1222(a)(2)(A) exception). While *Dawes* was pending in the Tenth Circuit Court of Appeals, the same legal issue was decided by the Bankruptcy Appellate Panel in *IRS v. Ficken,* 430 B.R. 663 (10th Cir. BAP 2010). *Ficken* was also appealed to the Tenth Circuit and after that court decided *Dawes* on June 21, 2011, it also reversed the bankruptcy court's judgment in *Ficken, see In re Ficken,* 2011 WL 3663727, 433 Fed. Appx. 682 (10th Cir. Aug. 23, 2011).

be paid in full unless the claim meets the criteria of § 1222(a)(2)(A), in which event the priority claim may be treated as an unsecured claim and discharged without being paid in full. In *Hall* the Supreme Court noted that postpetition claims could be § 503(b) administrative tax claims that are granted priority under § 507(a)(2) or prepetition tax claims under § 507(a)(8).[32] *Hall* turned on the question of whether the tax was "incurred by the estate" within the language of § 503(b) as required for a § 507(a)(2) priority claim. Because there is no separate taxable estate in a chapter 12 bankruptcy, the estate incurs no tax in a postpetition sale of farm assets and there is no priority tax claim that is subject to § 1222(a)(2)(A). Unlike *Hall*, our case involves a *prepetition* sale of farm assets and tax claim; there is no dispute here that the 2009 tax claim is a priority claim under § 507(a)(8) unless the § 1222(a)(2)(A) exception applies and permits debtors to treat it as an unsecured, dischargeable claim. Key to the *Hall* decision was the language of § 503(b)(1)(B); *Hall* did not interpret § 1222(a)(2)(A)'s "farm asset used in the debtor's farming operation" language that is central to resolution of the case at bar. Nor did *Hall* address the appropriate method for calculating the tax liability. To the extent the courts in *Hall, Ficken,* and *Knudsen* addressed these issues, the Supreme Court's opinion in *Hall* arguably did not abrogate those conclusions and they have at least persuasive authority here.

**B.     The Income from Feeder Cattle and Crop Sales Does not Qualify for § 1222(a)(2)(A) Treatment**

---

[32] 132 S. Ct. at 1885-86.

There is no dispute in this case that the real and personal property sold prepetition by these debtors were "farm assets."[33] But that alone does not qualify the tax on the proceeds of those sales for treatment under § 1222(a)(2)(A). The assets must be "used in the debtor's farming operation." The words "farming operation" are defined in the Code as –

> farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state.[34]

"Used in" is not defined in the Code. Certainly the cattle and crops sold and raised in 2009 were "farm assets," but whether they were "used in" the farming operation is less clear.

Absent a specific definition, the principles of statutory interpretation require me to give the words "used in" its ordinary or commonly understood meaning.[35] Courts can

---

[33] In its most basic and broadest terms, an "asset" is "[a]n item that is owned and has value," and consists of "entries on a balance sheet showing the items of property owned, including cash, inventory, equipment, real estate, accounts receivable, and goodwill." *See* BLACK'S LAW DICTIONARY (9th ed. 2009). No distinction is made in subpart (A) of the type of asset other than the descriptor "farm." No further refinement of the asset as a capital or fixed asset, a current or liquid asset, or tangible or intangible asset is made. *See In re Hemann,* 2013 WL 1385404 at *14 (Bankr. N.D. Iowa Apr. 3, 2013) (noting "any farm asset" is "all encompassing and broadly defined," debtor's 50% interest in farm partnership was a farm asset used in his farming operation.).

[34] Section 101(21).

[35] *Hamilton v. Lanning,* __ U.S. __, 130 S.Ct. 2464, 2471 (2010) (giving ordinary meaning to the word "projected" in undefined phrase "projected disposable income"); *Dalton v. I.R.S.,* 77 F.3d 1297, 1299 (10th Cir. 1996) (interpreting § 523(a)(1)(C) discharge exception language "willfully attempted in any manner to evade or defeat such tax" as including concealment of assets to protect them from execution or attachment).

-13-

resort to dictionary definitions for guidance in ascertaining the ordinary meaning of an undefined statutory term.[36] If that term as used in subpart (A) is unambiguous, there is no need to resort to legislative history or other rules of statutory construction.[37] Statutory language is ambiguous when (1) the words have more than one meaning; (2) the words are terms of art, having an unusual use of otherwise unambiguous words; or (3) the purpose, intent or object of the statute cannot be ascertained from the words used.[38] Any ambiguity must appear on the face of the statute.[39] As interpreted in this case, § 1222(a)(2)(A) is not ambiguous.

### 1. Feeder cattle and crops raised by debtor are not "used in" the operation.

Feeder cattle and crops are not "used in" a farming operation in the way that breeding stock, land, and equipment are. The dictionary definition of "used" is "employed in accomplishing something."[40] The verb "use" means "to put into action or

---

[36] *In re Gentry,* 463 B.R. 526, 528 (Bankr. D. Colo 2011).

[37] *In re Smith,* 447 B.R. 435, 446-47 (Bankr. W.D. Pa. 2011) (questioning *Knudsen* and *Hall* courts' adherence to the plain meaning rule of statutory interpretation; absent ambiguous statutory language, the court should not consider statutory purpose or legislative history citing *In re Phila. Newspapers, L.L.C.,* 599 F.3d 298, 304 (3d Cir. 2010)); *Dalton v. I.R.S.,* 77 F.3d at 1299 (If unambiguous statutory language is not defined, court gives language its common meaning, provided that result is not absurd or contrary to legislative purpose.); *Parks v. Anderson,* 406 B.R. 79, 93 (D. Kan. 2009) (If unambiguous, the court must interpret the statutory language according to its plain meaning.).

[38] *Zeigler Engineering Sales, Inc. v. Cozad (In re Cozad),* 208 B.R. 495, 498 (10th Cir. BAP 1997) (a "lien" includes consensual and judgment liens), citing *Kenan v. Fort Worth Pipe Co. (In re George Rodman, Inc.),* 792 F.2d 125, 128 n. 8 (10th Cir. 1986).

[39] *Id.*

[40] Merriam-Webster Dictionary Online, www.merriam-webster.com/dictionary/used?show=0&t=1370277726, June 5, 2013.

-14-

service" and is synonymous with apply, employ, and utilize, which mean to "put into service especially to attain an end.[41] To "use" an asset to achieve an end in one's farming operation means something narrower than to simply show that an asset is related or associated with a farming operation, as can be demonstrated with virtually any farm asset. Reading § 1222(a)(2)(A) to mean that an end product of farming or ranching, such as the harvested crops or the livestock raised, is a farm asset "used" in the debtor's farming operation is unnatural. It gives no meaning to the word "used." Black's defines "farm products" as crops and livestock produced in farming or products of crops or livestock in their unmanufactured state.[42] Part of the definition of a "farming operation" is the "production or raising of crops, poultry, or livestock [*i.e.* farm products], and production of poultry or livestock products in an unmanufactured state." Does one "use" farm products such as harvested crops and raised livestock to raise or produce farm products? Can we logically say that feeder cattle not maintained for breeding are assets "[employed] in the debtor's [ranching] or [raising of . . . livestock]?" Likewise, does it make sense to suggest that the crops the debtors raised in the 2009 tax year were assets they "[employed] in the [production or raising of crops]?"

A farmer feeding livestock and raising crops does not "use" the cows or crops that are raised; they are, instead, the fruits of the farmer's work. The more natural reading is that farm assets used in the production of crops or livestock are not the end

_____

[41] *Id.* at www.merriam-webster.com/dictionary/use?show=1373301879, July 5, 2013. *See also,* The American Heritage Dictionary Online, www.ahdictionary.com/word/search.html?q=use, July 5, 2013.
[42] BLACK'S LAW DICTIONARY (9th ed. 2009), farm products.

-15-

farm products themselves.[43] This is best illustrated by substituting a description of the particular assets sold for the words "farm assets" and inserting § 101's definition of "farming operation" into § 1222(a)(2)(A):

> . . . the claim is a claim owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of [feeder cattle] used in the debtor's [raising of livestock or production of livestock products in an unmanufactured state],

Likewise, in the case of the crops:

> . . . the claim is a claim owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of [corn, wheat, sunflowers, or alfalfa] used in the debtor's [production or raising of crops].

If every farm asset, including end products, is "used in" a farming operation, every sale or disposition of farm assets would receive § 1222(a)(2)(A)'s favored treatment. It seems unlikely that Congress would have chosen the "used in" language if it meant that the government's claim resulting from any sale of any property related or associated with a farming operation (including the end farm product) would be eligible for unsecured treatment, essentially granting chapter 12 debtors an income tax holiday for the prior year's taxes. Under this broad interpretation, the § 1222(a)(2)(A) exception would swallow the rule for § 507(a)(8) priority claims in many chapter 12 cases.

But two courts support the debtor's view. In *Knudsen*, a divided Eighth Circuit panel concluded that farm assets include any assets associated with the farm, holding

---

[43] *See In re Knudsen*, 581 F.3d 696, 721 (8th Cir. 2009), Colloton, J., dissenting.

in that case that slaughter hogs were farm assets that were part of the debtors' farming operation, which included the production of livestock. Thus, "farm assets" would include "any asset related to farming operations, whether or not actually used in farming operations."[44] "Farm assets" would therefore include what the opinion calls "capital assets under I.R.C. § 1231, other property that may receive favorable tax treatment . . . , and inventory items that would otherwise generate ordinary income under I.R.C. § 61."[45] The panel majority also pointed out that "used in" must connote the notion that the verb "use" does in § 363(c)(1) which authorizes the trustee to use the property of the estate in the ordinary course of business. *All* property that can be used, including inventory or other property held for sale (subject, of course, to the conditions and constraints of § § 363 and 364), would be property "used in" the operation. Under the majority's analysis, the I.R.C.'s § 1231 capital gains provision is of little avail in interpreting the Bankruptcy Code for three reasons. First, if a debtor can't "use" farm products held for resale under § 1222, the debtor can't use "inventory" under § 363. Second, because § 1222(a)(2) applies to claims owed to any governmental unit, not just the IRS, courts should not read the Internal Revenue Code's meaning into the bankruptcy code. Third, "to use" means "to apply or employ" and bred or raised livestock (but not necessarily crops) are "applied or employed" in farming.

---

[44] *Knudsen,* 581 F.3d 696, 712 (quoting the McQueen and Williams treatise, *Tax Aspects of Bankruptcy Law and Practice*).

[45] *Id.*

Case 10-12997   Doc# 95   Filed 07/08/13   Page 17 of 27

In *In re Ficken*, the Tenth Circuit Bankruptcy Appellate Panel adopted the *Knudsen* majority's reasoning on this point and held that the sale of debtor's calf inventory was the sale of a farm asset used in the debtor's farming operation. The *Knudsen* majority relied on a bankruptcy tax treatise, *Tax Aspects of Bankruptcy Law and Practice*, in which the authors caution against "rushing to the IRC, a body of law that seeks bilateral determinations between the government and a taxpayer, in order to understand provisions in the Bankruptcy Code, a body of law that seeks to resolve multilateral claims and rights in a context far different with far different policies than one would find under the IRC."[46] Like the Eighth Circuit, the *Ficken* panel looked to bankruptcy law rather than tax law to determine what these words mean in § 1222(a)(2).

The dissenting judge in *Knudsen* skillfully articulated the better view that § 1222(a)(2)(A)'s protection does not extend to the tax on farm income. In that case, the debtors raised hogs for slaughter. The dissenting judge applied § 1222(a)(2)(A) this way:

> They [debtors] raised livestock and sold them for slaughter. The slaughter hogs, therefore, were assets *produced by* the farming operation, not assets *used in* the livestock-raising operation. . . . The statute refers to claims arising as a result of *the sale* of an asset that was *already used* in the farming operation. The sale itself cannot be the use. With respect, the majority's analysis, adopted largely from a treatise on bankruptcy practice, overlooks this textual requirement.[47]

---

[46] *Ficken,* 430 B.R. 663, 673, quoting C. Richard McQueen & Jack Williams, Tax Aspects of Bankruptcy Law and Practice, 3d ed. at § 14:9.
[47] 581 F.3d at 721.

-18-

Nor did the dissent hesitate to consider the tax law in ascertaining § 1222(a)(2)(A)'s meaning:

> . . . I see no flaw in the bankruptcy court consideration of § 1222(a)(2)(A) *in pari materia* with the capital gains provision of 26 U.S.C. § 1231(b), which indicates that beneficial capital-gain tax treatment is limited to breeding livestock. The Knudsens and the majority acknowledge, even highlight, that a principal purpose of § 1222(a)(2)(A) was to address the treatment of a debtor's capital gains taxes. In that context, the analysis of § 1222(a)(2)(A) is better informed by the closely related provision of the Internal Revenue Code than by a provision of the bankruptcy code, 11 U.S.C. § 363, that operates in a different context and has no relation to tax claims (or any other claims of governmental units) arising from the sale of assets.[48]

Common sense suggests that "assets used in . . . [a] farming operation" are more akin to capital assets than those assets the debtors produce and hold for sale to end customers in the ordinary course of their business. The tax on the income generated by the sale of those assets should not be protected by § 1222(a)(2)(A) from priority treatment. While the language of § 1222(a)(2)(A) does not expressly refer to capital assets, Congress's use of the phrase "used in the debtor's farming operation" suggests that only the tax on the proceeds of sales of capital or working assets are eligible for 1222(a)(2)(A) treatment. This approach is consistent with the Internal Revenue Code's favorable tax treatment on the sale of property used in the trade or business and is what *Collier's* presumes to be the proper interpretation of § 1222(a)(2)(A).[49] And, while

---

[48] *Id.* at 721-22.

[49] *See* Alan N. Resnick and Henry J. Sommer, 8 COLLIER ON BANKRUPTCY ¶ 1222.02[2] (16th ed. 2012) (Intent of § 1222(a)(2)(A) stripping provision was to "render capital gains taxes on disposition of farm assets into general unsecured claims" for farmers' chapter 12 plan treatment.)

-19-

McQueen and Williams correctly suggest that the aims of the tax law differ from those of the bankruptcy code, there is no reason why courts should not consider tax law in interpreting that part of the bankruptcy code that specifically deals with priority tax claims.

The Internal Revenue Code carefully distinguishes between capital and other assets. Section 1221 of the Internal Revenue Code defines "capital" assets.[50] Excluded from the definition is property held for sale, real property used in a trade or business, and property held subject to depreciation.[51] But among the "special rules for determining capital gain" is I.R.C. § 1231(b)(1) which grants favorable tax treatment to various farm assets, including property "used in trade or business" that is subject to depreciation and held for more than one year, and real estate "used in the trade or business" that is held for more than one year, but excluding inventory or property held for sale to customers in the ordinary course of business.[52] It also includes livestock and, in particular, cattle and horses that are held for "draft, breeding, dairy, or sporting purposes" for more than 24 months.[53] Only *unharvested* crops are considered when the land on which they are growing and which is used in the trade or business is sold.[54]

---

[50] 26 U.S.C. § 1221.
[51] IRC § 1221(a)(1) and (2). It also excludes supplies regularly used or consumed in the taxpayer's trade or business. § 1221(a)(8). Gains from the sale of capital assets are further broken down into short-term and long-term capital gains depending on the length of time the asset is held. *See* § 1222(1) and (3).
[52] IRC § 1231(b)(1) and (b)(1)(A) and (B).
[53] IRC § 1231(b)(3)(A).
[54] IRC § 1231(b)(4). Presumably harvested crops are excluded from special capital gain treatment as inventory or property held for sale to customers under § 1231(b)(1)(A) and (B).

-20-

When the sale of §1231 property generates gain, that gain is treated as capital gain that is taxable at a lower rate; when those sales result in loss, that loss reduces ordinary income, which is usually taxed at a higher rate.[55]

The gains the Keiths reported on lines 13 and 14 of their return were the proceeds of sales of land and buildings, breeding stock, and equipment used in their farming operation. Those gains are reported on Form 4797 – sales of property *used* in a trade or business (§ 1231 property on Part I, Form 4797) and gains from the sale of certain depreciable I.R.C. § 1245 property (§ 1245 property on Part III, Form 4797).[56] By contrast, the income on their tax return from the sale of feeder cattle they raised were not "gains." Instead, the Keiths reported that income as ordinary farm income on Schedule F. They reported their crop income in the same fashion. Line 4 of Schedule F requests revenue from "sales of livestock, produce, grains, and other products you raised," not revenue from sales of farm products "used" in the farming operation. Indeed, the Part I instructions on Schedule F specify: "Do not include sales of livestock held for draft, breeding, sport, or dairy purposes. Report these sales on Form 4797."[57] Certainly none of the assets whose sale generated the farm revenue shown on Schedule F and Line 18 of Form 1040 are capital assets, either. The Internal Revenue Code distinguishes between assets "used in a trade or business" and those that are held for

---

[55] IRC § 1231(a)(2).
[56] Dkt. 80-1, pp. 15-16. IRC § 1245(a)(3)(A) - (F) specifically defines what depreciable property constitutes "§ 1245 property."
[57] Dkt. 80-1, p. 12.

sale to customers. There is no reason to construe the words "used in" one way in I.R.C. § 1231(b) and another way in Bankruptcy Code § 1222(a)(2)(A).

Nor does § 363's authorizing the trustee to "use, sell or lease property of the estate" in and outside the ordinary course of debtors' business or to "use cash collateral" affect the interpretation of the word "used" in § 1222. Section 363 generally applies to every remedial chapter. It does not address allowing the claims of a governmental unit or to treating those claims under a plan. Rather, § 363 governs the trustee's use or other disposition of property of the estate and defines when court authority is required to do that.[58]

The income tax generated by the debtors' ordinary farm income (Form 1040, Line 18) did not result from a sale of "farm assets used in the farming operation" and should be treated as a priority claim, not an unsecured claim under § 1222(a)(2)(A).

### 2. *Crop insurance proceeds are not "used in" the operation.*

Line 8 of Schedule F requests "crop insurance proceeds and federal crop disaster payments." That income is similar to ordinary income from the sale of farm products raised by debtors because it compensated the debtors for a failed crop. The Keiths reported $80,764 in farm income from crop insurance. No court has addressed whether the tax generated by crop insurance proceeds should receive §1222(a)(2)(A) treatment. Like crops, crop insurance proceeds are "farm assets," but nothing in the stipulations

---

[58] If any part of the Bankruptcy Code would guide the Court's interpretation of § 1222, it would be provisions from chapter 13, upon which chapter 12 was modeled. But the exception to full payment of certain priority tax claims added in § 1222(a)(2)(A) by BAPCPA is not present in the chapter 13 counterpart, § 1322(a)(2).

suggests that the Keiths used these insurance proceeds in their farming operation to produce or raise livestock, grains, or crops. Instead, these insurance payments are the proceeds of a failed crop and, like a successful crop, are "end results" of the debtors' farming operation. A claim for any tax they generate is a priority claim under § 507(a)(8).

### 3. The debtors will not "use" these assets in a reorganized operation.

In both *Knudsen* and *Ficken*, the debtors proposed to liquidate part of their property and reorganize using the proceeds of that liquidation to support their reorganized operation. The Keiths do not propose that. Instead, they intend to rely on off-farm employment for their post-confirmation income.[59] There is nothing in the record to suggest how the 2009 crops or cattle raised by debtors or the crop insurance proceeds would be "used" by the debtors in their reorganization.

### 4. None of the tax on the Schedule F income may be treated under § 1222(a)(2)(A).

None of the tax that was generated by the debtors' farm income reported on Schedule F is excluded from treatment as a priority claim by § 1222(a)(2)(A). That presents the second issue in allowing the Government's priority and unsecured claims: what calculation method to use in determining what portion of the IRS's total tax claim for 2009 "arises as a result" of the debtors' other farm asset sales.

---

[59] *See Ficken,* 430 B.R. at 674 (concluding that "farming operation" referenced in § 1222(a)(2)(A) is the farming operation of the reorganized debtor).

-23-

### C. The marginal method better measures the priority and unsecured claims than the proportional method.

Allowing the Government's priority and general unsecured tax claims can be done using either the proportional or marginal allocation method. The proportional method advocated by the Government involves dividing the debtors' ordinary farming income by their total income and multiplying the Government's total tax claim by the fraction that results. That result, in turn, is subtracted from the Government's total claim and the remainder is the unsecured claim eligible for treatment under § 1222(a)(2)(A). The marginal method advocated by the debtors involves preparing a pro forma tax return that omits the income from the sale of assets and subtracting the pro forma tax from the total tax due on their actual return. The remainder would represent the amount of tax that arose from the sale of eligible farm assets. The *Knudsen* and *Ficken* courts considered this issue at length and adopted the marginal tax allocation method.[60] When the Supreme Court reversed the *Knudsen* decision and the Tenth Circuit reversed *Ficken*, neither court addressed this issue. Nevertheless, the Government, some commentators, and at least one judge suggest that proration strikes the best balance between the farmer's interest in successfully reorganizing and the government's interest in maximizing revenue, while "the marginal method, by contrast, is a one-sided approach that tilts in favor of the debtor by disproportionately reducing

---

[60] *Knudsen,* 581 F.3d at 718; *Ficken,* 430 B.R. 663, 678.

Case 10-12997   Doc# 95   Filed 07/08/13   Page 24 of 27

the amount of tax unrelated to the sale of farm assets that is entitled to priority treatment."[61] I disagree.

The problem with the proportional method is that simply carving up a farmer debtor's tax bill into proportions by applying the ratio of the debtor's non-sale income (priority tax claim) to the debtor's total income and dividing the total tax claim accordingly ignores the impact of tax deductions and tax credits on the farmer's ultimate tax liability, many of which are indexed to income and phase out as it increases.[62] As the Bankruptcy Appellate Panel noted in *Ficken*,

> Personal deductions and credits are those that are unrelated to the cost of earning income. Generally speaking, personal expenses are not deductible, but for policy reasons and/or based on ability to pay, Congress permits some personal expenses, such as costs for medical care, to be deducted, and gives credits for others, such as tuition for higher education. However, when a taxpayer's AGI reaches a certain level, he or she is perceived as a "high income taxpayer" who should not benefit from these personal deductions and credits.[63]

Because of the graduated nature of the income tax, the proportional method dramatically and artificially increases the debtor's adjusted gross income and significantly inflates the Keiths' priority tax obligation to an amount several times that which it would be under the marginal method. It ignores the effects of various deductions and credits that are tied to a debtor's income level by maximizing the debtor's taxable income and, in turn, minimizing the debtor's deductions.

---

[61] *Knudsen,* 581 F.3d at 723 (concurring and dissenting judge).
[62] *Knudsen,* 581 F.3d at 717-18 (noting that the proportional method treats each dollar of income the same while the income tax is a graduated tax).
[63] *Ficken,* 430 B.R. at 677-78.

-25-

There is no reason to burden the debtors with this result when the effect of the debtor's ordinary farming income on the Keiths' taxes can easily be measured by preparing an actual tax return that recognizes all of their ordinary farm income as well as gain income and comparing it to a hypothetical return that only recognizes ordinary farm income. The difference between the two results is directly attributable to the gain income that arose from the sale of qualifying farm assets—those used in the farming operation.

The proportional method doesn't measure what income "causes" which portion of the tax claim. It is, instead, simply an approximation, one that in this case errs heavily in the Government's favor. While using it may strike some sort of balance between the government's quest to realize revenue and the debtor's desire to lessen his or her priority tax burden, nothing in the Bankruptcy Code requires us to strike that balance.[64] The point instead is to accurately allow the Government's priority and unsecured claims. Section 1222(a)(2)(A) links its relief from the priority tax treatment to the amount of income tax caused by the sale of farm assets and courts should employ the most accurate available means of determining the extent of that relief.

In sum, that amount of income tax that arises from all of the debtors' income that was realized upon the sale or disposition of their farm assets (Form 1040, Lines 13 and 14), determined using the marginal method, may be treated as a general

---

[64] Indeed, the purpose behind this priority stripping measure was to reduce the negative tax consequences resulting from a sale of farm assets that had to be paid in full, thereby enabling family farmers to successfully confirm plans of reorganization. *See Ficken,* 430 B.R. at 675.

unsecured claim under § 1222(a)(2)(A). The Government's remaining income tax claim should be allowed and treated as a § 507(a)(8) priority tax claim that must be paid in full under § 1222(a)(2).

### D. Further submissions are required before the Court can determine the allowed amounts of the IRS's priority and unsecured claims.

While the income tax claim resulting from Line 13 and 14 income may be treated as a general unsecured claim under § 1222(a)(2)(A), there is nothing in the stipulations to assist me in applying the marginal method to calculate that portion of the Governments claim. I therefore direct the parties to supplement the stipulations by calculating the amounts of the Government's § 1222(a)(2)(A) general unsecured and priority tax claims in a manner consistent with this opinion, including prepetition interest on the priority claim,[65] within 28 days of its entry. If the parties are unable to stipulate concerning those amounts, counsel should advise the Clerk accordingly so that the matter may be set for a prompt evidentiary hearing.

# # #

---

[65] Dkt. 81, ¶s 18-19.